oral argument, and we begin with United States v. Walker, Ms. Matyska. May it please the Court, as a housekeeping matter, a matter of operations, I'm going to address the Court regarding sufficiency of the evidence related to some of the quantity issues. Mr. Kretzer, my co-counsel, is going to address the Court regarding some of the sentencing issues, and then co-counsel Mr. Girtz is going to address the Court regarding an issue that's specific to his client. My name is Jamie Matyska. I represent Zerrick Walker. This case stems from a federal investigation into a drug conspiracy that was being allegedly committed by the Ardwan family. A mother, father, and four brothers, two of those brothers are defendants in this cause of action, as well as I think about five to eight of their associates and relatives were also indicted in this case. Zerrick Walker, my client, is a cousin of the Ardwan family. The conspiracy, which was a conspiracy to possess with intent to deliver cocaine in the amount of 280 grams or more, was alleged to have occurred over a span of a decade, starting in January of 2006 and all the way through May of 2016. This is important to my client, Mr. Walker, because he was incarcerated for nine years of the alleged 10-year conspiracy. Now, the jury in this case found the conspiracy as a whole liable for 280 grams and then assessed that amount individually against each defendant, including Mr. Walker. As this court is aware, drug quantity is limited to the amount that an individual is directly involved in or that is reasonably foreseeable to the defendant. I think the important issues in this case that are before the court is what type of evidence is going to be sufficient in this post-Allene climate to establish quantity beyond a reasonable doubt, as well as issues regarding foreseeability related to the individual defendants. In this case, there's really three types of evidence that were submitted on quantity. There is a small amount that is well below the 280-gram mark that was submitted on evidence that was actually seized and tested. That amount is around 127 grams of cocaine, so that's what we know was tested and produced by the government. Now, specific to my client, that amount was seized in four separate searches. Pursuant to four separate search warrants, two of those occurred while my client was incarcerated. So if you look at page 19 of my brief, I actually went through the testimony of all the chemists, the analysts in this case, and listed out what I could tell the testimony showed. The reports are not in the record. What occurred to me last night as I was reading back through all this testimony is that it's very confusing because the government did not make a point to establish what of the tested evidence was seized when. My client cannot be held responsible for evidence that was seized while he was incarcerated. Some of these I've highlighted here I was able to ascertain came from the 2010 search or the 2013 search. So even this number that I've put here in my brief is still inflated. So we're just not sure in terms of my client, even with regard to seized amounts, what amount could be reasonably foreseeable to him and certainly not directly attributed to him. Now, there are. You just realized this last night. Did you argue this before? Yes, ma'am. I mean, we argued in the brief that, you know, my client was incarcerated for a long duration. I know your position, but about the specific amounts. Yeah, the realization last night was really just in the manner that it was presented to the jury. I had not realized that the actual reports were not admitted as exhibits, and in going through the testimony I became very confused when trying to ascertain which amount was seized when. You weren't trial counsel. No, ma'am. No, Your Honor, I was not. And what I was able to ascertain from some of the lab report numbers, and what we know is that some of this quantity was seized during the period that my client was incarcerated. So even with regard to what's been produced, it can't be attributed to him. Now, there is two more categories of evidence aside from what's been seized and produced. There is general, very general, vague officer testimony. Now, this residence, this particular residence, was surveillanced over a long period of time by different officers, and they testified very generally to foot traffic, what they perceived to be drug-related activity. They're not testifying about controlled buys. They're not testifying about amounts. They're not even testifying about witnessing specific transactions. Another issue in this case— But aren't there a lot of our decisions that give credence to foot traffic as legitimate evidence that the jury can consider? Your Honor, I don't think there's a lot of decisions that give credence to only general testimony regarding foot traffic to establish a statutory, mandatory minimum beyond a reasonable doubt. I mean, we're not talking about a sentencing issue here. We're not talking about a preponderance of the evidence or what's sufficient to support what's in the PSI. We're talking about postaline, putting this to a jury, establishing beyond a reasonable doubt, and no, I would submit to the court that there are not decisions saying that when all you have is general testimony stating there was some foot traffic, there looked like there was drug activity going on. To me, that is nonprobative. It is no evidence of quantity in this case. The third category of evidence that we have is evidence of two lay witnesses, Mr. Robeson and Mr. Broussard, who supposedly engaged in transactions with the defendants. Again, Your Honor, I would submit to the court that their testimony is too general and too vague, especially with regard to Zarek Walker. One of the problems with Mr. Broussard's testimony is that he testified he bought drugs from the Ardwan family every day starting in 2013. Again, Mr. Walker was incarcerated during that time frame. Another problem with this testimony is that if the court would look closely at the testimony of Mr. Broussard, he never states ever quantity. He does not testify to a quantity. He testifies generally that he purchased cocaine from the defendants more than 20 times and less than 50 times. There is no evidence of quantity. The government has asked this court to make assumptions about what that quantity was, saying, let's just assume it was an eight ball. I don't think we can make assumptions to support the jury's verdict beyond a reasonable doubt. It was the government's burden to put forth evidence, and they had a decade-long period of surveillance to do that, and they didn't do it. They didn't meet their burden. It doesn't support the jury's finding. We can't just assume it was a certain amount. That's nonprobative. It's no evidence of quantity. Well, the jury can infer. I'm not sure if there's a difference between an inference and an assumption, but the jury, I mean, that's basic that the jury can infer from all this evidence that there was basically daily drug trafficking at this house. I agree, Your Honor, but I don't think the jury can infer quantity beyond a reasonable doubt based on nothing but the existence of a transaction. Thank you, Ms. Metesky, and you've saved time for rebuttal. Mr. Kretzer? Good morning, and I'm pleased to report Seth Kretzer for the defendant, Cody R1. My argument about sentencing largely incorporates some of the same arguments that you just heard from Ms. Matuska. These are more particularly about the quantity of vermin that ultimately came into the PSR that were adopted by the district court at the sentencing. But I think even when we do move away from beyond reasonable doubt issues that Ms. Matuska was just talking about into the more capacious, relevant conduct, the ponderance that prevails at sentencing, the problems, the error is propagated and gets that much larger. I'd like to begin my argument with a few simple factual parameters that I don't think the government will disagree with me on that came from the trial. The first is that the actual physical evidence, this comes most particularly from Officer Pinckney, as well as the lab chemists who testified as to quantity. Those individuals, while their numbers were off a little bit, were in the 150-170 gram area, substantially below 280. Now I understand, certainly as Judge Smith said a second ago, or asked a second ago, foot traffic, other sort of conduct is certainly evidence that a jury can consider. It builds innocence within the sentencing judge at sentencing. But we would urge this court to look at the magnitude of additional quantity that came in here. In other words, even if one accepts that we took the physical evidence in that 150-170 range and the other evidence such as Mr. Broussard, Roberson, those people who testified about my client, even if those folks were able to get one up to the 280-gram range, which the government, of course, charged in this case, when we get to the relevant conduct, to the sentencing guideline, one could take that 280 grams, Your Honor, one could triple that 280 grams if one wanted to, and you would still be at the base offense level of 30. You have to go all the way up to 840 plus .1 before one even gets up to level 32. But that's not what probation did here. Probation, if one goes down the rubric of how they scored this, goes through those actual amounts. They go through some other, let's say, closely appended relevant conduct. And then, of course, we have the very problematic element where they say officer surveillance operations, and we have this mammoth quantity of 4,100 grams. In other words, the direct evidence at the trial was substantially beneath the 280. Even if we said we'd get up to 280, now we're at 20 times as much just in that one particular aspect of how probation scored this. And wasn't this a 20-year conspiracy? I don't know if it was quite 20. I think it was more on the order of a little more than a decade. And, of course, I think we went to 2006. It wasn't a 10-year conspiracy. I'm sorry, pardon? I thought it was 20 years, but if it's 10 years, it's still just as egregious that it would go on for so long uninterrupted. It was a lot of drugs. Yes, and I wasn't trying to minimize it as a long-running conspiracy. I'm pretty sure my co-counsels will correct me if I'm wrong. I think we're dealing 2006 to 2011. So even an 11-year conspiracy, yes, a substantial amount of time. Did Judge Crone say she would have given the same sentence even though there was perhaps an error with the drug quantity? Yes, she says that, and it's also reproduced in the statement of reasons that I put into my brief. And we certainly understand that there's case law saying that the procedural dimensions of a sentence, I guess it's largely insulated or pre-permitted might be the better word, if a sentencing judge has that language. And I know from experience that language has become quite standard among sentencing courts across this – I say the state of Texas, the Fifth Circuit. But our arguments would still be, even if that's the controlling precedent, that the logic of the sentencing guidelines going back now from 15 years, Rita, Gall, Kimbrough, requires a very precise order of operations. First, that there should be a correctly calculated procedural determination, and then the substantively correct sentence is chosen after that. It would be our position that if a district court were to simply say, well, I would impose this sentence regardless, would be functionally no different than if a district court said I choose to ignore the guidelines, the procedural aspect, and go straight to the 3553A substantive factors. And even if we're bound by that precedent here, we would still ask the panel to make a note of the procedural errors in this case so that we could have that issue concretized as the right word but fairly presented if we were to seek further review of the matter. So that is my argument in a nutshell. If there's no further questions, I'll yield back my remaining 28 seconds or answer any other questions. Thank you, Mr. Kretzer. Mr. Gertz. Good morning, Your Honor. I represent Christopher Ardwan in this case. I want to, as our brief did as well, adopt co-counsel's arguments relating to quantity in both the conspiracy and individually Mr. Ardwan's, Christopher Ardwan's case. But the specific issue I wanted to address with you was the gun count. He was charged with a gun conspiracy. The jury found him guilty of a gun conspiracy, and the evidence was extremely limited as it related to guns. There was evidence that a house that he didn't live in didn't belong to him. There was a gun found underneath the house belonging to we don't know who. There was evidence that another house that he doesn't live in, there was a gun found in a locker, a safe that didn't belong to him, and it went in his gun. And when the government was confronted with this at the directive verdict stage of the proceedings, the government shuffled around and shuffled around and couldn't really find any evidence of a gun. So they actually referenced something on a jail call that the judge described herself as being confusing and said, well, that's – the word gun was used in a jail call. And that was really where the government came down with their evidence of a conspiracy. I would note for the court that it was somebody else saying the word gun. My client didn't respond to it saying anything about gun, didn't talk about buying guns or selling guns or possessing guns or anything of that nature. And every time my client was arrested as it related to these cases and the evidence that was put on, there was no gun present. He never had a gun in his possession. None was ever found at his home. None was ever found in his room. None was ever found at his property. None was ever found in his vehicle. A lot of ammunition found. I recall some testimony about that, but I don't recall it being in my client's possession. Again, I think the concern that we had was that in terms of conspiracy, that my client has to do some act in furtherance of the conspiracy as it relates to guns. And again, without him ever possessing – I think he just has to join the conspiracy and someone else has to do the act. At least one member has to do the act, but he doesn't have to have the guns himself if he's part of this conspiracy that's involving the use of guns with drugs. Well, I guess it depends, Your Honor, on how you count the conspiracy in the language. Is it he joined the drug conspiracy and thus gun conduct in the drug conspiracy is imputed to him, or does he have to join sort of a separate, which is what he's charged with, a separate firearms conspiracy? Right, I think it's a separate conspiracy he's charged with, but he doesn't have to have the guns. He has to be part of an agreement that guns will be used in the drug trafficking. He doesn't have to have them on him in his house. Correct, and there was no testimony that Christopher Ardwan agreed with anybody to do anything about guns, I guess. So, I mean, to your point, I think the evidence was insufficient even to reach that. So we would ask for an acquittal on that second issue. Thank you, Your Honor. All right, thank you, Mr. Gertz. Mr. Rawls? Good morning. Bob Rawls from the United States. The government is going to start with the sufficiency of the evidence as to the conspiracy. It was clear from the evidence that more than 280 grams of crack cocaine was involved in this conspiracy. It was a decade-long conspiracy from 2005, I believe, through 2016. Why did the DEA or whoever is in charge of drug conspiracies, why did they allow this to go on for 10 years? Actually, this was viewed as a local case for a long time, and one of the police officers testified about this, and it is somewhat relevant to the federal conspiracy. They would arrest these defendants from time to time. In fact, all three of these appellants had prior convictions based on local police surveillance and arrest and search warrants run. They must have not served much time. That's exactly right. It was a frustrating situation. There were over 13 family members involved in this conspiracy. And as these confusing jail calls that they say are confusing show, when one of them would go to jail, such as Christopher Arjuan, he would literally direct others from the jail over jail calls to move firearms, sell drugs to raise his bail, have others, hey, watch out for Cody, he's running the trap now. These inmates are advised that the phone calls are being monitored, right? Sure. They certainly are, Your Honor. But they have an operation to run, and this is what the local police testified they found so frustrating was, hey, if we do these cases individually, we're never going to shut this down. And this was a pervasive operation. There were two houses literally 30 feet apart from each other, 1107 and 1109. 1107 is where all the foot traffic was observed. Literally so much foot traffic over the course of years that sometimes cars would be lined up outside this house like a fast food restaurant. And the house next door, the duplex next door was known as the stash house, according to the testimony. And this was where the safe was found with two firearms and a crack in the safe as well. And this was where they generally would cook the crack, bring it next door to 1107, and sell. So as far as sufficiency goes, the chemists at trial introduced approximately 100 and maybe 127 grams of actual crack. They also introduced about 84 grams of powder cocaine, which was used in the conversion to crack. There was also testimony from Howard Broussard, who was a family friend who spent years at this house buying crack from all three of these appellants, as well as watching them sell literally to hundreds of customers, according to his testimony. This is a guy that is not your typical customer. He actually had a degree in nursing and actually had another degree in automotive technology. Just after a series of crises, he said, you know what? I'm just going to try crack. And he knew the Arduans. He knew the location of their house. He had been there for years and years. So he was an excellent witness who described the operation of this, and it was literally just an ongoing crack cocaine operation for years. Then we have the testimony of Mr. James Robertson. He testified that he dealt primarily with Cody Arduans, the youngest of the Arduans. He rented his car to Cody Arduan, kind of known as Rent for a Walk. And he rented his car to Cody Arduan for up to five months for an ounce of crack a week. And he actually rode around with Appellants Walker as well as Cody Arduan while they also sold out of this car. That's why they needed the car. So this went on for five months. And so what the pre-sentence report did was simply take these figures and try to quantify them, which is a perfectly legitimate way of extrapolation. There are a number of Fifth Circuit cases that address extrapolation that the government put in its brief. There's Valdez, Villegas, Valverde, Perez. They all use slightly different methods of quantifying drugs that were not seized, such as the smuggler got the same fee on his third attempt that he was caught. So they were able to quantify his two earlier loads. That's a Perez case. Even the case cited by the appellants from the First Circuit, Sepulveda, although they cite it as in support of their case, they use extrapolation in that case that was upheld. That included the cash sale value of drugs. They were able to convert that amount to a quantity. So as far as the sufficiency of the evidence getting past 280 grams, the pre-sentence report, taking away this 4,100 grams they complain about, the pre-sentence report came up with 780 grams. And it's listed in a chart in the pre-sentence report. I think the government's reproduced some of it and so has the defense or the appellants. And the pre-sentence report itself says, hey, these are conservative figures. These are conservative figures. They took the bottom estimates of these figures. And so this is without the 4,100 grams. Now, this is what the district court is hearing during the trial is the testimony of the seizures of these four search warrants, Ron, of which all three of these appellants were present at at least two of those four search warrants. Any two of those, they were present. And drugs were seized. And guns were seized. And so this is what the district court had as a context when it's then faced with the decision of these officers' surveillance operations. Now, six police officers testified at this trial, five or six. They were all fairly knowledgeable of the Ardoin family. They had all either arrested or interviewed the Ardoins at one time or their cousins. And so they knew them very well. And two of these were very experienced narcotics officers who actually their job was to actually surveil the residents. And one of them surveilled it for four years, which is what led to some of these search warrants over the years. And so he testified that, you know, based on his observations, these were hand-to-hand sales of crack cocaine that he could see outside on the porch and in the yard and as these cars would drive up. And so the pre-sentence report had to do something with that testimony, so they quantified it. Now, this is in context to Mr. Broussard's testimony. He was actually inside the house, and he saw hundreds of these transactions inside that the officer couldn't see. Same thing with Mr. Robertson out in the car driving around. And so then there's another officer who testified, hey, I only surveilled it for two years. And I estimate I saw 10 to 15 transactions an hour. I could quantify this down to about 100 grams that I saw transacted. And so the court is faced with a dilemma of what to do with this 4,100 grams. Does it parse it out and try to come up with a smaller amount? It really wasn't necessary, because for two of these appellants, once you pass 280 grams for Appellants Walker and for Christopher Ardoin, it's a statutory minimum. For Mr. Walker, it was 20 years. For Christopher Ardoin, it was life. So for them, the analysis stopped at 280 grams. Its most dramatic impact of these 4,100 grams is with Cody Ardoin, because even though he had a prior conviction, it couldn't be counted for enhancement purposes because it took place during this conspiracy. And he went to state jail for about 18 months. And so they discounted that time for him and the activity out of the conspiracy while he was in state jail. And so it has its most dramatic effect on Cody Ardoin, this 4,100 grams. It shoots him up four offense levels. Now, that sounds like a lot, and in terms of years, it is. It added 62 months to his sentence. But remember, the pre-sentence report says, hey, these numbers are conservative. These are very conservative numbers, and at 780 grams. And so just 60 more grams would have put him in the next offense level, which would have put him in our same guideline range where his current sentence sits. But it would be at the top of the guidelines. It would shoot him up two levels, whereas the 4,100 grams shot him up four levels. And so Judge Crone had to look at all of the testimony and put these 4,100 grams in context. And she found that the officer's testimony was sufficiently reliable to go ahead and credit that amount toward Cody Ardoin. And that was a factual finding. It's not a much different factual finding than the three points he got for being an organizer leader of the conspiracy while some of the other brothers were in jail. It wasn't much different from the factual finding where they gave him two points for a firearm. All those shot him up in the guidelines too. So Judge Crone felt that the officer's testimony, especially two of them that were very experienced, had a sufficient indicia of reliability that she could rely on that to do a sentence to include those 4,100 grams in the guidelines. And she did say at sentencing that she would give the same sentence as she would have given. And sometimes the Fifth Circuit probably does hear that on a regular basis. But in this case, it was probably much more sincere because of all the appellants. The testimony was much more dramatic toward Cody Ardoin. Even though he was the youngest appellant, the youngest member of this conspiracy, he was also the most prolific distributor of the entire family. And it is sad. He grew up in this life. And so that is why he got the sentence that he did. I'd like to touch on a little bit about the firearms conspiracy also as to Christopher Ardoin. There was actually a firearms recovered during this conspiracy. As early as 2007, an officer testified that as a result of some disturbance at the Ardoin house, he actually chased Christopher Ardoin into or at the foot of the Ardoin residence. And a subsequent search incident to that arrest produced a shotgun that was hidden underneath the house. It wasn't inside. It was underneath the house. And so they recovered a shotgun as early as 2007. Christopher Ardoin, he gets arrested a number of times in search time over the years. In 2010, he's present at a search warrant where they recover a lot of ammunition. They recover a large quantity of 9mm ammunition as well as a 9mm handgun magazine. In 2015, after a car chase in which he wrecks out and the police have a foot chase and they arrest him, he's in jail. He's making these phone calls, directing some of the enterprise. One of those calls, he directs his girlfriend to contact someone to transfer a firearm from one person to another. He issues all kinds of other instructions too. And these are confusing. It does take— Do we know who the person is? I think it's Booney. Is there anything in the record to say that that was someone who had a role in this? I don't think it was one of the charged co-conspirators, but it was someone that one of the officers knew. But I don't recall the exact testimony. But all these names were familiar to the officer who was testifying about the cause. And they are in somewhat of a code. It does take an experienced narcotics officer to decipher this for a jury and a judge. And that was his take on it, that, hey, this was some directions, among others, to transfer a firearm. But that's just small testimony. Just later that year, after he does make his bail and he gets out, there is a search at the stash house next door. There's a safe. They open up the safe. This is his brother Cary's house, Cary Orduan, who had pled earlier in the case. They recover a distributable amount of crack out of the safe, two handguns, a revolver, and a semiautomatic firearm. They recover some other drugs. So there were some firearms in this conspiracy that were recovered. So it wasn't as though it was based simply just on testimony. There were photographs of the firearms introduced at the trial. Were they all charged with gun offenses or just— No. Christopher Orduan was the only one charged with firearms conspiracy. At some point, when one of these superseding indictments came out, that was added to it. Why just him? I don't know why. Was it his house? He primarily was living at 1107, the main house where these drug activities took place. Is that where the safe was? No, the safe was next door at the stash house where his brother Cary lived. But he lived in the house where the shotgun was recovered underneath. I think it was probably the jailhouse calls where they decided—for some reason, they decided to charge him with a firearms conspiracy. In the scheme of things, it's not as important as, obviously, his crack conviction, which garnered him life. But— Would it make a difference in the sentencing? No, it would not. If the—it ran concurrent, so if the drug conviction were upheld, it would have really no effect. It's simply a concurrent. If it wasn't upheld? If it was not upheld, would it have an effect? Yes, he would have a 20-year sentence. Also, I just wanted to mention just briefly as to—in regards to Mr. Walker, counsel had indicated that the lab reports were not introduced at trial. That's not unusual at a federal trial. Lab reports are not introduced. They're generally considered hearsay. You have to have the live chemists there. They testify as to findings, and the lab report is generally not introduced, and that's why that wasn't done. It's generally just a matter of practice. If there are not any other questions? Thank you, Mr. Rawls. Thank you, Your Honor. Ms. Matuska? Your Honor, I'd like to start by just clarifying that with regard to the lab reports not being in evidence, my point there was not that they're missing and they should have been introduced. It really was more to the fact that the testimony that's in the record is unclear and does not establish when, what time period in which, the various amounts the chemist testified to was seized. That is particularly important to my client because Mr. Walker was incarcerated during two of the searches. You made that point before. I don't want you to use your time for that because we heard that. No problem, Your Honor. Quickly, the government also touched on sufficiency of the evidence in the context of the PSI. I just want to point out to the court that my client was not sentenced above the he received the mandatory minimum. His guidelines range was well below that at 151 to 181 months, even though the district court imputed the entire 280 grams to him based on conduct that occurred throughout the entire duration of the conspiracy. I think those findings are in conflict with the circuit precedent, which says you can't be held liable for or responsible at sentencing for conduct that occurred before you joined the conspiracy. Now, the government in this case conceded in its briefing, I think pages 50 and 51, that my client had not joined this conspiracy until 2015. So there are some problems there in the PSI, but even at 280 grams, Mr. Walker was only looking at 151 to 181 months, so he was given the mandatory minimum sentence based just on the jury's finding. So that does set him apart from the other defendants and makes the sufficiency argument very specific to him and outside the context of what is sufficient in terms of preponderance of the evidence in a PSI. The government referenced Mr. Roberson's testimony, and I just wanted to point out to the court with regard to that testimony. That testimony really had to do with Cody Ardwine making this arrangement with Mr. Roberson about using his car. When Mr. Roberson was asked at trial specifically if Walker was involved in the car deal, his testimony was he didn't have no dealings to do with the car, but I did buy drugs from him sometimes. Again, the evidence is unclear as to quantity, as to when, as to how much. It's just insufficient to support the 280 grams. I would urge this court to take a look at its prior decision in the United States v. Daniels. That was a case in which this court found the evidence insufficient to establish quantity. The seized and produced amounts in that case were added up to 1.5 kilograms, but the jury assessed liability, responsibility to the defendants for 5 kilograms. In that case, this court touched on testimony similar to that here in regards to other sales, where there were no quantity amounts. The court found without more evidence as to the quantity of other sales, this jump to 5 kilograms was unsupported. The government there had sort of, the theory of that case was what was presented was just the tip of the iceberg. I would submit to this court that that is extremely similar to the testimony of Officer McBride in this case, who testified 280 grams is easy over the years at this residence. Again, not to Mr. Walker, who was incarcerated for the bulk of that time. We would ask that the court reverse the window of judgment. Thank you. Ms. Matuska, we noticed also the court notices that you and Mr. Kretzer and Mr. Gertz are all court appointed, and we wish to thank you for your willingness to take the appointment. That's always helpful to the court, and we appreciate your hard work on behalf of your clients.